**No. 57622.**—Inter-Maritime Forwarding Co., Inc. v. United States, protest 179658–K (New York).

OLIVER, Chief Judge: The protest in this case is limited to certain items described on the invoice as "Transformers, Continental–Leads, Continental," which are contained in case No. 5, and as "Edison Screw Transformers," which merchandise is contained in case No. 8.

The involved merchandise was classified and assessed for duty under the provision contained in paragraph 228 (a) of the Tariff Act of 1930 covering ophthalmoscopes and parts thereof, finished or unfinished, at the rate of 60 per centum ad valorem. Several claims are made by the plaintiff herein, but the one chiefly relied on by it is that the involved articles are dutiable at only 15 per centum ad valorem under the first provision in paragraph 353 of the said act, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, for "Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy," or under the provision in the same paragraph, as modified, for "articles having as an essential feature an electrical element or device * * * all the foregoing * * * finished or unfinished, wholly or in chief value of metal, and not specially provided for," and parts thereof.

A sample of the item invoiced as "Edison Screw Transformers," was received in evidence as plaintiff's exhibit 1. A sample of the item invoiced as "Transformers Continental" was received in evidence as plaintiff's exhibit 2. No sample of the item described as "Leads, Continental" was introduced in evidence but plaintiff's witness testified that it is a flexible twin wire "that connects the transformer to other instruments, like an ophthalmoscope" (R. 5).

It was stipulated between the respective parties that "the Continental transformers and leads therefor, as represented by Exhibit 2 in the above case, as well as the Edison screw transformers, as represented by Exhibit 1 in the above case, are both composed in chief value of metal."

The manager of the company for whose account these articles were imported testified that his company was engaged in the business of selling ophthalmoscopes, transformers, optical goods, "various types of optical goods." The witness stated that an "Edison Transformer" (plaintiff's exhibit 1) is an instrument to transform current from one voltage to another. It consists of a metal transformer in a casing, which is the outside part of the transformer, and contains three terminals with openings or "hooks" for attachment to other instruments. Describing the use of the article, he stated that it screws into an electric outlet in the same way as in an ordinary household electric outlet. From the three terminals in the article, three volts are emitted, permitting any instrument that requires 3-volt output or 3-volt current to be connected to these terminals. As to the use of the three "hooks" contained in plaintiff's exhibit 1, the witness explained: "If the household current is 110 Volts, the connecting wires from the 3-volt instrument will be used from this current and connected to the 110 Volt terminal." "If the current voltage is lower than 110 for instance 100 Volts, then you connect it to the other two terminals and that gives you the correct output of three volts from those two terminals when the instrument is used for 100 Volts" (R. 6).

Plaintiff's exhibit 2, the "continental" transformer, is a transformer which is connected to the current by a "lead" or wire extending from one end of the instrument. "The end of the wire goes into the electric current of the house." Four terminals are located at the end which is opposite to where the wire or lead

is attached on the transformer. These terminals are marked, respectively, "0," "3V," "6V," and "12V." On the top of the metal casing of the instrument is a rheostat, by means of which the current may be increased or decreased. On the face of the transformer appear the words "Keeler Optical Products Ltd." Explaining the functions of this instrument, plaintiff's witness gave the following testimony:

A. Yes, from these terminals current is emitted from the outside two terminals, 12 volts.

Q. You are referring to the terminals marked "0" and 12-Volts?—A. 0 and 12 volts; from the terminal marked "0" and the terminal marked 6 Volts, six volts is emitted. From the terminal marked "0" and 3-Volts, three volts is emitted. This current may be varied by turning the rheostat on top of the metal casing.

Q. If you plug in the 12 Volt current, that is plug your wire into "0" and "12-Volt," and you turn this handle all the way up you will get 12-Volt and if you decrease it, or turn it to the left you will get less than 12 Volts?—A. Yes, it will go down to Zero; you can turn it down, the voltage from 12, to six down to Zero.

Q. Does that also apply to the other terminal?—A. Yes, if connected with 6-Volts it will go from six volts to Zero; if connected to 3-Volts it will go from three volts to Zero.

Q. What is the purpose of that patented transformer?—A. To transform household current to take any instruments that require that voltage.

The witness testified that a transformer, such as plaintiff's exhibit 2, is used with but is not attached physically to an ophthalmoscope, an instrument for illuminating the retina or back of the eye to enable a doctor to discover any disease, if present therein. A lead is plugged into the transformer at one end and plugged into the ophthalmoscope or "any other instrument" at the other end. "To make the ophthalmoscope light, the base of the ophthalmoscope is connected with the lead, not shown here, and that lead is connected with any 12 volt output" (R. 9). He stated that it is not necessary to have a transformer to operate an ophthalmoscope, inasmuch as "If the current available is 12-Volt, then the instrument can be connected directly to that 12-Volt," in which case a transformer is not needed. He further testified that the transformers in question (plaintiff's exhibits 1 and 2) are complete instruments in themselves and were not designed for use with any particular instrument but were designed merely to give the varying currents, from zero to 12 volts, for any particular instrument used which requires voltages between those points; that they do not perform any function other than to change the voltage of electric current; and that, in the case where correct electric voltage is applied for the operation of ophthalmoscopes, these transformers serve no useful purpose toward increasing the efficiency of the ophthalmoscopes with which they are used. The witness further stated that there are ophthalmoscopes without transformers which are complete instruments in themselves, ready to perform their essential functions, the electric current merely supplying the motivating power for the ophthalmoscope.

On cross-examination, the witness testified that his company deals mainly in ophthalmoscopes and is an agency of the Keeler Optical Products Co. of England. He stated that he had on occasion sold transformers manufactured by another company but that most of the transformers sold by his company are Keeler transformers (R. 13). While the witness testified that the transformers in question were not specially designed to be used with Keeler products, but were designed to be used with various types of instruments, he had not seen them used with any other equipment. He agreed that the price of the transformers, as indicated on the invoice covering this importation, was included in the price of

the ophthalmoscopes with which they were shipped but explained that the parent company in England wanted the ophthalmoscopes to include the price of the transformers in the consignment and did not want to break it down "because of the work involved." He then stated that a large percentage of the Keeler continental ophthalmoscopes are sold without transformers and that, in such cases, the doctors purchasing the ophthalmoscopes have rooms already equipped to take 12-volt current.

The witness further testified on cross-examination that carrying cases for the Keeler ophthalmoscopes are likewise sold to doctors and that they are specially fitted to include a Keeler transformer. He admitted that doctors who purchase Keeler ophthalmoscopes with Keeler transformers order replacements on the transformers. He likewise admitted that he had never seen these transformers, plaintiff's exhibits 1 and 2, used with anything but an optical instrument (R. 19) and testified that "It wouldn't be reasonable to use it for anything but that which it was designed for." While the witness stated that he "believed" the transformers under consideration had the same voltage as toy train transformers, he also stated that he did not have any toy train manufacturers as customers. He further testified that the main reason for the manufacture of these transformers by the Keeler Optical Products Co. was for use in connection with its optical instruments and stated that he never sold transformers to the electrical trade.

A catalog issued by the Keeler Co. of England and used by that company and the plaintiff company for 4 years, titled "Optical Instruments by Keeler," was received in evidence as defendant's exhibit A. At page 21 thereof, appears a picture of a continental ophthalmoscope and a continental transformer, such as plaintiff's exhibit 2. In describing the transformer, the booklet states: "A specially designed transformer to give a maximum output of 12w. fitted with a variable control to allow for dimming, which is necessary when the instrument is being used for Direct Ophthalmoscopy." With reference to the Keeler ophthalmoscope, it is stated therein that "The ophthalmoscope is powered by a 12v. 12w. lamp and must of necessity be operated from a special transformer (see illustration). The intensity of the light is controlled by a knob on the transformer." The plaintiff's witness explained in this connection that "Any 12 Watt transformer would operate that ophthalmoscope because 12 Watts is the current." He further testified that the continental transformer (plaintiff's exhibit 2) also permits a decrease in voltage so that you can run other equipment from that transformer and stated that there was nothing particular about this continental transformer "to make it useful for only the ophthalmoscope, except that it gives the 12 Volt, 12 Watt output and that is all."

The catalog above mentioned also illustrates a lead or wire attached to the Keeler ophthalmoscope by means of which the instrument is connected to the two outside terminals of the transformer (likewise illustrated) which give the 12-volt current.

The question here for determination is whether or not the transformers and leads in question are parts of ophthalmoscopes. If they are, then the collector's classification must be sustained; if not, then these articles are classifiable under paragraph 353, as claimed by plaintiff.

The principle of relative specificity, discussed at length in defendant's brief, has no bearing on the determination of the present issue.

Ophthalmoscopes and transformers are separate and distinct entities. Each performs its own individual function. The ophthalmoscope is an instrument used for illuminating the retina to permit examination of the back of the eye. Plaintiff's uncontradicted testimony shows that the ophthalmoscopes referred to

herein are electrically operated and require 12-volt current. The transformers and leads in question are used in conjunction with ophthalmoscopes only when it is necessary to adjust electric current to the proper voltage. "A big percentage" of these ophthalmoscopes is sold without the transformer. Such sales occur when doctors' rooms "are fitted to take the 12 Volt current; they already have their rooms equipped to take that current * * * " (R. 15).

The case of *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C. P. A. (Customs) 322, T. D. 46851, cited in plaintiff's brief, is in point. There, the merchandise consisted of wooden tripods which the importer claimed were classifiable as parts of cameras. The court found from the testimony in that case that certain types of cameras required a tripod for support while being held in a given position, and that, when in use, the tripods were connected with those cameras by means of screws which extended upwardly through the flat circular heads of the tripods and fitted into sockets in the cameras. In holding that the tripods were not classifiable as parts of cameras, the court stated as follows:

It is a well-established rule that a "part" of an article is something necessary to the completion of that article. It is an integral, constituent, or component part, without which the article to which it is to be joined, could not *function as such article.* *Welte & Sons* v. *United States*, 5 Ct. Cust. Appls. 164, T. D. 34249; *United States* v. *American Steel & Copper Plate Co.*, 14 Ct. Cust. Appls. 139, T. D. 41673; *Peter J. Schweitzer, Inc.* v. *United States*, 16 Ct. Cust. Appls. 285, T. D. 42872, and cases cited therein; *United States* v. *John Wanamaker*, 16 Ct. Cust. Appls. 548, T. D. 43266.

\*       \*       \*       \*       \*       \*       \*

It is evident, we think, from the character of the articles and from the testimony in the case, that, when a tripod and a camera are used together, each "performs its separate function without loss of any of its essential characteristics." Whether separate or joined, each is complete in itself, each is a distinct and separate commercial entity. See *United States* v. *Borgfeldt & Co.*, 11 Ct. Cust. Appls. 105, T. D. 38750; *Dow Co.* v. *United States*, 11 Ct. Cust. Appls. 249, T. D. 39077; *Columbia Shipping Co. et al.* v. *United States, supra; United States* v. *Kalter Mercantile Co. et al., supra.*

We are of the opinion, therefore, that, although it may be necessary to use *tripods* as *supports* for the involved *cameras*, tripods are not, for that reason, integral, constituent, or component parts of such cameras. The most that can be said is that the two articles—a tripod and a camera—are designed to be used together, one as a support for the other, and that they are chiefly so used. [Italics quoted.]

The case of *United States* v. *E. Leitz, Inc.*, 26 C. C. P. A. (Customs) 418, C. A. D. 49, is also in point. In that case, the merchandise consisted of a photographic range finder, designed to be detachably mounted on a camera but capable of being used separately. Its function was to ascertain, by manipulation, the distance of the object to be viewed in order that the camera may be put in critical focus. The range finder was held not to be a part of a camera, and, in reaching the conclusion, the court cited the *Willoughby Camera Stores, Inc.*, case and then stated that "when the range finder here involved and the camera for which it is designed are used together, each 'performs its separate function without loss of any of its essential characteristics,' and 'whether separate or joined, each is complete in itself, each is a distinct and separate commercial entity.' "

The reasoning employed in the cited cases has equal application here. In this case, the transformers and the leads perform their separate functions, without the loss of any of their essential characteristics. The articles are not integral, constituent, or component parts of ophthalmoscopes. Even though it might be said that the transformers and the leads are designed to be used with the ophthalmoscopes included in the present shipment, the articles under consideration are merely accessories used, under certain circumstances, in connection with ophthalmoscopes. Under the two cited cases, they are not parts of such instruments.

The transformers and leads under consideration are provided for within paragraph 353 which embraces "Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device * * * all the foregoing * * * finished or unfinished, wholly or in chief value of metal, and not specially provided for," and parts thereof. The applicable rate for the present merchandise is 15 per centum ad valorem under said paragraph 353, as amended by T. D. 51802.

That claim in the protest is sustained, and judgment will be rendered accordingly.